UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

MARK LEE TAYLOR and PAMELA TAYLOR,

                  Plaintiffs,

        vs.

HONEYWELL INTERNATIONAL, INC.; JEPPESEN SANDERSON, INC.; and DOES 1-100,

                  Defendants.

Case No:  C 10-04659 SBA

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Docket 41

On August 25, 2009, Plaintiffs Mark Taylor and Pamela Taylor (collectively "Plaintiffs") commenced the instant action against Defendant Honeywell International, Inc. ("Honeywell" or "Defendant") in the Superior Court of the State of California, County of San Francisco, alleging claims for strict products liability, negligence, and loss of consortium.  Compl., Dkt. 1.  The action was removed to this Court on the basis of diversity jurisdiction.  Notice of Removal, Dkt. 1.  The parties are presently before the Court on Honeywell's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Dkt. 41.  Plaintiffs oppose the motion.  Dkt. 48.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Honeywell's motion for summary judgment, for the reasons stated below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed.R.Civ.P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

I.     **BACKGROUND**

    A.    **Factual Background**

       This action arises out of an alleged near crash of an aircraft on January 15, 2008 ("the incident").  Plaintiff Mark Taylor ("Taylor") claims he suffered "severe emotional

distress" when the aircraft he was piloting on that day for United Airlines "almost crashed" during a landing approach into San Francisco International Airport ("SFO") because the aircraft's flight management computer displayed inaccurate information due to a defect in the flight management system and/or its component parts.  See Am. Consol. Compl. ¶¶ 1, 10, 17, 29, Dkt. 36.  Instead of working as intended, Plaintiffs claim that the flight management system directed the aircraft ("United Airlines 901") over the San Francisco Bay, approximately 1,000 feet to the right of the designated runway.  Pls.' Opp. at 1.  Due to low visibility from fog, Taylor and the flight crew did not discover the aircraft's location over the San Francisco Bay until after the aircraft had come within a few hundred feet of the water.  See id.; Taylor Dep. at 89:9-18; Fritch Dep. at 84:19-85:1.  As a consequence of the incident, Taylor claims he has suffered severe emotional distress caused by "fear of safety."  See Pls.' Opp. at 2; Am. Consol. Compl., ¶ 1.  According to Taylor, more than five medical professionals have diagnosed him as suffering from Post-Traumatic Stress Disorder ("PTSD") and major depressive disorder as a result of the incident.  Pls.' Opp. at 2.

### 1.      The Parties

Taylor began his professional flying career in 1981 with the United States Air Force, and had been a First Officer for United Airlines for seventeen years on the date of the incident.  Taylor Dep. at 7:17-19; 9:19-10:8.[1]  At the time of the incident, Taylor had more than 10,000 hours of flight time.  Id. at 8:23-9:1.  Pamela Taylor ("Mrs. Taylor") is Taylor's wife.  Am. Consol. Compl. ¶ 2.

Honeywell is an avionics manufacturer.  Pls.' Opp. at 1.  Honeywell allegedly manufactured, designed, sold, and installed the flight management system in the Boeing 747-400 aircraft Taylor was piloting on the date of the incident.  See Am. Consol. Compl. ¶ 10.  Honeywell's flight management system, which includes a navigation database, was designed to provide pilots guidance to within 50 feet of the centerline of the designated

---

[1] Taylor was based out of San Francisco during his entire career with United Airlines.  Taylor Dep. at 8:2-7.

runway.  Brooks Dep. at 62:22-63-12.[2]  On the date of the incident, there was an error in Honeywell's navigation database.  Spratt Dep. at 151:19-152:23, 154:11-22, Exh. 10. When United Airlines tested the navigation database in its simulator after the incident, the aircraft impacted the water instead of landing at SFO.  See id. at 140:2-9.[3]

### 2.    Incident Overview

On the date of the incident, Taylor was the First Officer and the pilot flying United Airlines 901 during its first landing approach into SFO.  Taylor Dep. at 37:4-10, 72:19-73-9; Fritch Dep. at 30:12-18.  Albert Langelaar ("Langelaar") was acting as the Captain with the ultimate responsibility for the safety of United Airlines 901.  Langelaar Dep. 102:16-103:2; 198:9-13.  Donna Fritch ("Fritch") was acting as the Relief First Officer.  Fritch Dep. at 14:3-6.

Prior to the first landing approach into SFO, Taylor conducted an approach briefing wherein he verbally reviewed the missed approach procedures, including the "decision altitude,"[4] which is the point at which the crew must either see the runway environment or execute a missed approach.  Taylor Dep. at 89:9-11,112-113:24, 118:1-16.  As part of this briefing, the flight crew was informed that United Airlines 901 had the capability of performing a missed approach at SFO, Fritch Dep. at 48:2-49:12, which typically occurs when a pilot cannot see the runway.  Spratt Dep. at 42:6-19.[5]  The missed approach

---

[2] It is undisputed that John Brooks is a navigation database engineer for Honeywell.

[3] According to Honeywell, "[w]hile the fact of a near crash is hotly contested, there is no dispute that . . . [t]he alleged database error caused the incorrect frequency and course to be selected for the approach, resulting in a misalignment with the intended runway." Def.'s Mtn. at 1.

[4] Decision altitude is defined as "a specified altitude in an instrument approach procedure at which the pilot must decide whether to initiate an immediate missed approach if the pilot does not see the required visual reference, or to continue the approach.  Decision altitude is expressed in feet above mean sea level."  14 C.F.R. § 1.1.  No pilot may operate an aircraft or continue an approach below the authorized decision altitude, except under certain limited circumstances.  See 14 C.F.R. 91.175.

[5] Thomas Spratt was United Airline's 747 Fleet Technical Captain at the time of the incident with the responsibility for operational issues with the fleet and was the pilot member of any flight safety investigation.  Spratt Dep. at 20:22-21:8.

procedure involves a series of steps whereby a pilot discontinues his landing approach and climbs to a higher altitude.  Id. at 42:20-43-1.  After the pilot ascends in altitude, he or she decides whether to attempt a second approach or land at a different location.  Id. at 43:1-3.

At approximately 350 feet, i.e., about 135 feet before United Airlines 901 reached the decision altitude of 213 feet, Captain Langelaar directed a "go-around" procedure or missed approach because he did not see the runway due to low visibility from clouds, and because he had a "gut feeling" that something was wrong.  See Langelaar Dep. at 84:2-22, 94:3-20, 95:2-9, 96:2-15; Taylor Dep. at 89:9-21.[6]  Shortly thereafter, Taylor successfully executed a missed approach.  Taylor Dep. at 90:21-92:9.[7]  According to Captain Langelaar, the aircraft responded normally and climbed away from the airport.  Langelaar Dep. at 99:13-100:4.  According to Relief First Officer Fritch, once the missed approach was initiated, the aircraft starting ascending within a "couple of seconds."  Fritch Dep. at 102:22-103-1.

After Taylor initiated the missed approach, he looked out the window and saw the San Francisco Bay.  See Taylor Dep. at 243:16-25.  Captain Langelaar also observed the San Francisco Bay for one or two seconds, but not until after the aircraft had started to ascend.  Langelaar Dep. at 94:21-95:14.  According to Relief First Officer Fritch, the aircraft did not descend below 100 feet of decision altitude, i.e., below 313 feet.  Fritch Dep. at 102:3-10.

After Taylor executed the "go-around" procedure, Captain Langelaar attempted a second landing approach into SFO, but decided to "go-around" at 1,500 feet because the plane was at minimal fuel and because he concluded that there was something wrong with

---

[6] Apparently, the air traffic controllers at SFO failed to warn Taylor that United Airlines 901 was off course on the first approach into SFO.

[7] According to Fritch, a couple of seconds passed from the time Captain Langelaar gave the "go-around" order and Taylor's initiation of the procedure.  Fritch Dep. 101:12-102:2.  At her deposition, Fritch testified that Captain Langelaar yelled "go-around" two times because Taylor did not immediately respond to his first order.  Id. 101:12-20.  Fritch also testified that "maybe three seconds" passed from the time Captain Langelaar initially gave the order to "go-around" and Taylor's initiation of the procedure.  Id. at 101:21-102:2.

the navigation on the aircraft after the "approach control" informed him that the aircraft was off course.  See Langelaar Dep. at 115:7-117:7.[8]  Captain Langelaar subsequently declared a full emergency and landed United Airlines 901 at the Oakland Airport, landing without relying on the aircraft's instruments, i.e., Captain Langelaar landed the aircraft using a visual approach.  Id. at 116:23-117:21,118:4-6.  After several hours on the ground, the fog lifted and the crew flew to SFO, landing using a visual approach.  Taylor Dep. at 102:3-5; 103:4-8.

### 3.   Missed Approach Procedures and Training

The instrument landing approach flown by Taylor on the date of the incident is known as a Category I Instrument Landing System 28 Right ("Cat I ILS 28R").  Taylor Dep. at 196:13-17; Langelaar Dep. at 68:6-11.  The decision altitude for this type of approach is 213 feet, which is the reference point at which the crew must see the runway and the runway environment and meet all the criteria for continuing the approach or execute a missed approach or "go around" procedure.  Spratt Dep. at 49:12-50:2.  A pilot may not descend below the decision altitude of 213 feet when conducting a Cat I ILS 28R approach unless the airport environment is in sight.  Taylor Dep. at 89:9-13.  If the airport environment is not in sight at the decision altitude, the pilot must immediately initiate a missed approach.  Taylor Dep. at 96:25-97:6; Spratt Dep. at 50:19-22, 257:11-258:6; see 14 CFR § 1.1.  In order to properly descend below the decision altitude, the following three requirements must all be met: (1) the aircraft must be in a position to conduct a normal descent to the runway; (2) the pilot must have the minimum in-flight visibility; and (3) the pilot must have distinct visual reference with the runway environment.  Taylor Dep. at 252:10-253:12; Fritch Dep. 42:13-44:4.

---

[8] Captain Langelaar testified that while he was coming around for the second approach into SFO, he felt like he had just experienced a "life-threatening event" because he was "trembling."  Langelaar Dep. at 109:3-8.  Captain Langelaar further testified that the "go around" was not "normal" as the aircraft was not on a "normal approach."  Id. at 109-3-19.  However, he testified that if a "go-around" is initiated before 220 feet, the Boeing 747-400 is fully capable of performing a missed approach at 220 feet above water.  Id. at 110:7-12, 145:4-11.

Before beginning any landing approach, the pilot flying the aircraft briefs the procedures for a missed approach and ensures that the aircraft can safely execute a missed approach or "go-around" procedure.  Langelaar Dep. at 152:3-7; Fritch Dep. at 48:49-7. Missed approach procedures are briefed before the first flight of the day.  Spratt Dep. at 235:20-23; Fritch Dep. at 48:10-13.  Prior to a landing approach, the flight crew prepares to conduct a missed approach by reviewing the procedures, and the pilot flying the aircraft verbally goes over the missed approach instructions.  Fritch Dep. at 48:2-50:22.  The purpose of preparing for a missed approach is to ensure that there are no surprises as to what the procedures are in the event of a missed approach.  Id. at 49:13-50-12; Langelaar Dep. at 152:3-12.  A missed approach is not an emergency procedure and is not considered an emergency in the aircraft.  Fritch Dep. at 105:6-22; Langelaar Dep. at 100:5-22.

United Airlines pilots are provided flight manuals, training, and simulator experience for conducting missed approach procedures in the Boeing 747-400 Taylor was piloting on the date of the incident.  Taylor Dep. at 105:4-106:14; Def.'s Request for Admissions ("RFA"), Set One, Nos. 6, 8  United Airlines pilots are expected to perform a missed approach just as it is described in the manuals, and are trained to conduct missed approaches from the minimum altitude specified for the particular landing approach.  Spratt Dep. at 236:6-10, 256:16-24.  A Boeing 747-400 aircraft is fully capable of performing a missed approach at 220 feet above mean sea level.  See Langelaar Dep. at 110:7-12, 145:4-11.

Pursuant to United Airline's policy, pilots are taught that paper aeronautical charts have priority over aeronautical data in a navigation database such as Honeywell's.  Def.'s RFA, Set One, No. 10; Spratt Dep. at 154:11-155:14, Exh. 10.  United Airlines pilots are required to verify that the correct frequency and course of the aircraft are displayed by the

database by reviewing the information on the paper aeronautical charts.  Spratt Dep. at 151:19-152:23, Exh. 10.[9]

**B.     Procedural Background**

On August 25, 2009, Plaintiffs commenced the instant action in the San Francisco Superior Court against Honeywell.  See Compl.  The original complaint alleged claims for strict products liability, negligence, and loss of consortium.  Id.  On October 16, 2009, Honeywell removed the action to this Court on the basis of diversity jurisdiction.  Notice of Removal.  On February 18, 2011, the instant action was consolidated with an action brought by Plaintiffs against Jeppesen Sanderson, Inc.  Dkt. 32.

On February 28, 2011, Plaintiffs filed an amended consolidated complaint alleging three claims for relief against Honeywell: (1) strict products liability; (2) negligence; and (3) loss of consortium.  See Am. Consol. Compl.  Plaintiffs generally allege that on January 15, 2008, "Taylor sustained severe emotional distress when the Boeing 747-400 plane he was piloting almost crashed in San Francisco, California, because the plane's flight management computer displayed inaccurate approach information."  Am. Consol. Compl. ¶ 1.

On October 12, 2011, Honeywell filed a motion for summary judgment.  Dkt. 41. On October 13, 2011, the parties filed a stipulation dismissing Jeppesen Sanderson, Inc. from this action under Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure.  Dkt. 44. Plaintiffs filed an opposition to Honeywell's motion for summary judgment on October 26, 2011.  Dkt. 48.  A reply was filed on November 2, 2011.  Dkt. 54.

///

///

---

[9] In response to discovery requests, Taylor denied that he failed to review the relevant paper aeronautical charts to verify that the flight management computer displayed the correct identifier and course information on the first landing approach into SFO.  Def.'s RFA, Set One, No. 12.  While Taylor's response to discovery requests indicates that he reviewed the paper aeronautical charts prior to the first landing approach into SFO, he failed to explain why he did not discover that the aircraft was off course until after he initiated the missed approach.

## II.    DISCUSSION

### A.    Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A material fact is one that could affect the outcome of the suit under the governing substantive law.  Id. at 248.  For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party.  Id.

When, as here, the nonmoving party bears the burden of proving the claim, the moving party need only point out through argument that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001); Fairbank v. Wunderman Cato Johnson, 212 F.3d 528, 532 (9th Cir. 2000).  Summary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to her case, and on which she will bear the burden of proof at trial.  Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 805-806 (1999).

Once the moving party has met its burden, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial.  Celotex, 477 U.S. at 324.  To carry this burden, the nonmoving party must show more than the mere existence of a scintilla of evidence, Anderson, 477 U.S. at 252, and "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In fact, the nonmoving party must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving party's favor.  Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

See Las Vegas Sands, LLC v. Nehme, 632 F.3d 526, 532 (9th Cir. 2011); Orr v. Bank of Am., NT & SA, 285 F.3d 764, 772 (9th Cir. 2002); see also Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." Anderson, 477 U.S. at 255.

**B.     Strict Products Liability and Negligence Claims**

The first two claims for relief alleged in the operative complaint are for strict products liability and negligence. A plaintiff injured by an allegedly defective product may seek recovery at the same time on alternate theories of strict liability in tort and in negligence. Milwaukee Electric Tool Corp. v. Superior Court, 15 Cal.App.4th 547, 557, 561 (1993) ("There is a melding of legal theory in strict products liability, such that a finding of strict liability rests on a showing that the manufacturer departed from proper standards of care."). To a large extent, the two theories parallel and supplement each other. Id. at 557 (noting that in deficient design cases, strict liability and negligence merge).[10] Insofar as duty and breach are concerned, there is a functional similarity between a negligence theory and strict products liability. Id. at 559. "Although strict products liability causes of action need not be pled in terms of classic negligence elements (duty, breach, causation and damages), the concept of a manufacturer's duty to provide defect-free products is inherent in the usual form of pleading of a strict liability cause of action." Id.; Ford v. Polaris Industries, Inc., 139 Cal.App.4th 755, 768 (2006).[11]

///

---

[10] "Strict liability differs from negligence in that it eliminates the necessity for the injured party to prove that the manufacturer of the product which caused injury was negligent. It focuses not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective." Brown v. Superior Court, 44 Cal.3d 1049, 1056 (1988).

[11] Under California law, a claim of strict products liability is stated where the complaint alleges that: (1) the product reached plaintiff without substantial change in its condition; (2) the product was used in the manner intended; and (3) plaintiff was injured as a result of a defect in the product, of which the plaintiff was not aware, making the product unsafe for its intended use. Milwaukee Elec. Tool Corp., 15 Cal.App.4th at 559.

### 1.      Exception to the General Duty Rule

Honeywell moves for summary judgment on the ground that it does not owe a duty of care to Taylor as a matter of law under the factors identified in Rowland v. Christian, 69 Cal.2d 108, 112-113 (1968).  See Def.'s Mtn. at 13-20.  Under established California law, a manufacturer owes a duty of care to foreseeable users of its product.  See Bettencourt v. Hennessy Industries, Inc., 205 Cal.App.4th 1103, 1118 (2012) (citing cases).  Because the general duty to take ordinary care in the conduct of one's activities indisputably applies to product manufacturers, the issue is whether a categorical exception to that general rule should be made in these circumstances.  See id.  The question of duty is decided by the court, not the jury.  Ballard v. Uribe, 41 Cal.3d 564, 572, n. 6 (1986).

The Court finds that Honeywell has failed to sustain its burden to demonstrate that it is entitled to judgment as a matter of law on the ground that it did not owe Taylor a duty of care as a matter of law.  Honeywell's moving papers do not cite the California Supreme Court's most recent decision articulating the proper analysis to use in determining whether the Rowland factors support an exception to the general rule that each person has a duty to use ordinary care and is liable for injuries caused by his failure to exercise reasonable care under the circumstances.  See Cabral v. Ralphs Grocery Co., 51 Cal.4th 764, 771 (2011).  Instead, Honeywell primarily relies on Lawson v. Management Activities, Inc., 69 Cal.App.4th 652, 655 (1999) in support of its position that it did not owe a duty of care to Taylor.  In Lawson, the court analyzed the Rowland factors and held that "the duty of care imposed on airplane operators does not extend to the emotional distress suffered by physically untouched spectators of plane crashes, even spectators who, for a brief moment, reasonably fear for their own safety."  See id. at 655.  Because Lawson is factually distinguishable and does not apply the analysis articulated in Cabral, it does not control.

In Cabral, the California Supreme Court explained that the general rule in California is that everyone is responsible for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person.  Cabral, 51 Cal.4th at 771 (citing Cal. Civ. Code § 1714(a)).  In other words, each person has a duty to

use ordinary care and is liable for injuries caused by his failure to exercise reasonable care in the circumstances.  Cabral, 51 Cal.4th at 771.  The Court further explained that it had previously identified the several considerations that, when balanced together, may justify a departure from the fundamental principle embodied in § 1714:  (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered injury; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach; and (7) the availability, cost, and prevalence of insurance for the risk involved.  Cabral, 51 Cal.4th at 771 (citing Rowland, 69 Cal.2d at 113).  The Court stressed that "in the absence of a statutory provision establishing an exception to the general rule of . . . [§] 1714, courts should create one only where 'clearly supported by public policy.' "  Cabral, 51 Cal.4th at 771.

The Court went on to emphasize that:

Before applying the Rowland considerations to the duty question . . . , we note an important feature of the analysis: the Rowland factors are evaluated at a relatively broad level of factual generality. Thus, as to foreseeability, we have explained that the court's task in determining duty is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . .

In applying the other Rowland factors, as well, we have asked not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy. . . .

By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, we preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the court to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the jury to make.

Cabral, 51 Cal.4th at 772 (citations and quotation marks omitted and emphasis in original).

The legal decision that an exception to § 1714 is warranted, so that the defendant owed no duty to the plaintiff, or owed only a limited duty, is to be made on a more general

basis suitable to the formulation of a legal rule, in most cases preserving for the jury the fact-specific question of whether or not the defendant acted reasonably under the circumstances.  Cabral, 51 Cal.4th at 773.  In Cabral, the Court noted that California law accords with the Restatement Third of Torts view, which provides: " 'No-duty rules are appropriate only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases.' "  Id. at 773, n. 3.  The Restatement further provides:

> In conducting its [duty] analysis, the court may take into account factors that might escape the jury's attention in a particular case, such as the overall social impact of imposing a significant precautionary obligation on a class of actors. These cases are properly decided as duty or no-duty cases.  When no such categorical considerations apply and reasonable minds could differ about the competing risks and burdens or the foreseeability of the risks in a specific case, however, courts should not use duty and no-duty determinations to substitute their evaluation for that of the factfinder.

Id. (quotation marks omitted).

The Court finds that Honeywell's moving papers fail to demonstrate that a categorical no-duty rule is appropriate, i.e., a categorical exemption to § 1714's duty of ordinary care is warranted.  Cabral, 51 Cal.4th at 771.  Notably absent from Honeywell's moving papers is a discussion of the "important feature of the analysis" identified by Cabral; namely, that "the Rowland factors are evaluated at a relatively broad level of factual generality."  Cabral, 51 Cal.4th at 772.  Honeywell does not identify the category of cases that should be "carved out" from § 1714's general duty rule, let alone provide legal analysis demonstrating that such a "carve-out" is "justified by clear considerations of policy."  Instead, Honeywell urges the Court to follow the approach rejected by the California Supreme Court; namely, an approach that focuses the duty inquiry on the specific facts of this case.  See id. at 772-773.

To the extent that Honeywell, in its reply brief, attempts to rectify its failure to follow the analysis set forth in Cabral, it has failed to do so.  Citing Cabral, Honeywell argues for the first time in its reply brief that "the public policy question is whether avionics manufactures should be exempted from potential liability claims by professional pilots who

1    'fear for their safety' while successfully implementing standard operating procedures in a

2    non-emergency missed approach."  Def.'s Reply at 5.  According to Honeywell, "the

3    category of negligen[t] conduct at issue here is a navigation database error.  The kind of

4    harm is a commercial airline pilot who executed a standard, successful missed approach

5    and claims to have suffered severe emotional distress.  It is 'categorically unforeseeable'

6    that a professional pilot who executed a successful standard missed approach as a result of

7    a database error and landed safely thereafter will suffer severe emotional distress caused by

8    the very experience for which he is trained and employed."  Id. at 6 (citations omitted)

9        Since Honeywell failed to present this argument in its moving papers, the Court need

10   not consider it.  New arguments presented by a party in a reply brief are improper.  See

11   Cruz v. International Collection Corp., 673 F.3d 991, 998 (9th Cir. 2012) (holding that

12   issues which are not argued specifically and distinctly in a party's opening brief are

13   waived); see also Cedano–Viera v. Ashcroft, 324 F.3d 1062, 1066 n. 5 (9th Cir. 2003)

14   (declining to consider new issues raised for first time in reply brief); Tovar v. U.S. Postal

15   Serv., 3 F.3d 1271, 1273 n. 3 (9th Cir. 1993) ("To the extent that the [reply] brief presents

16   new information, it is improper."); see also United States ex rel. Giles v. Sardie, 191

17   F.Supp.2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce

18   new facts or different legal arguments in the reply brief than those presented in the moving

19   papers."); Ass'n of Irritated Residents v. C & R Vanderham Dairy, 435 F.Supp.2d 1078,

20   1089 (E.D. Cal. 2006) ("It is inappropriate to consider arguments raised for the first time in

21   a reply brief.").

22       In any event, the Court finds that the new arguments presented by Honeywell fail on

23   the merits.  As an initial matter, the Court questions Honeywell's framing of the duty issue.

24   According to Honeywell, the "category of negligen[t] conduct at issue here is a navigation

25   database error."  Def.'s Reply at 6.  The Court disagrees.  Under Cabral, the Court must

26   evaluate the Rowland factors at a broad level of factual generality.  Cabral, 51 Cal.4th at

27   772.  The essential question is not whether the facts of a particular case justify departure

28   from the general duty rule, "but whether carving out an entire category of cases from that

1   general duty rule is justified by clear considerations of policy."  See id. at 772-773, n. 3

2   ("No-duty rules are appropriate only when a court can promulgate relatively clear,

3   categorical, bright-line rules of law applicable to a general class of cases.").  For instance,

4   as to foreseeability, "the court's task in determining duty 'is not to decide whether a

5   particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's

6   conduct, but rather to evaluate more generally whether the category of negligent conduct at

7   issue is sufficiently likely to result in the kind of harm experienced that liability may

8   appropriately be imposed. . . .' "  Id. at 772.  Thus, under Cabral, the issue is properly stated

9   as whether a categorical exception to the general duty of ordinary care should be made

10  exempting avionics manufactures from potential liability to users of their products.

11      In its reply brief, Honeywell did not properly identify the category of negligent

12  conduct at issue in this case.  This is a fatal flaw because the category of negligent conduct

13  informs the analysis of whether an exception to § 1714 is warranted.  Based on Honeywell's

14  framing of the issue and its arguments, the Court finds that Honeywell has improperly

15  requested the Court to base a duty ruling on the detailed facts of this case.  See Cabral, 51

16  Cal.4th at 774 ("[O]n duty[,] California law looks to the entire 'category of negligent

17  conduct,' not to particular parties in a narrowly defined set of circumstances. . . . To base a

18  duty ruling on the detailed facts of a case risks usurping the jury's proper function of

19  deciding what reasonable prudence dictates under those particular circumstances.") (citing

20  Jackson v. Ryder Truck Rental, Inc., 16 Cal.App.4th 1830, 1841 (1993) (rejecting, as an

21  improper "ultra-specific manner" of defining risk, the defendant's claim that "it was not

22  reasonably foreseeable that the decedent would be struck by an errant vehicle 'while

23  standing on the shoulder of the roadway four feet inside the fog line' ").

24      In short, the Court concludes that Honeywell has failed to sustain its burden to

25  demonstrate that it is entitled to judgment as a matter of law on the ground that it did not

26  owe a duty of care to Taylor.  Honeywell did not show that a departure from the general

27  duty rule is warranted by clear considerations of policy under the analysis set forth in

28  Cabral.  Accordingly, Honeywell's motion for summary judgment is DENIED.

## 2.     Emotional Distress in the Absence of Physical Injury

Honeywell moves for summary judgment on the ground that emotional distress damages are not available when one fears for one's own safety in the absence of physical injury when the fear is not reasonable or results from a risk that could have been avoided. Def.'s Mtn. at 20-23.

California law allows emotional distress damages in actions premised on strict liability and negligence where the plaintiff has not suffered physical injury.  See Kately v. Wilkinson, 148 Cal.App.3d 576, 586-588 (1983) (holding that emotional distress damages are recoverable in an action premised on strict liability in the absence of physical injury to the plaintiff)[12]; Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 986 (1993) (holding that in an action for negligence, physical injury to the plaintiff is not a prerequisite for recovering damages for serious emotional distress, especially where there exists a guarantee of genuineness in the circumstances of the case).  The Ninth Circuit and California have held that a plaintiff may maintain a tort cause of action to recover emotional distress caused by fear for one's own safety where there are no physical injuries.  See In re Air Crash Disaster Near Cerritos, Cal., 973 F.2d 1490, 1494 (9th Cir. 1992); Wooden v. Raveling, 61 Cal.App.4th 1035, 1038 (1998).

However, "[r]ecovery of emotional distress damage has been allowed, absent impact or physical injury, in certain specialized classes of cases.  Where the negligence is of a type which will cause highly unusual as well as predictable emotional distress, recovery has been allowed."  Branch v. Homefed Bank, 6 Cal.App.4th 793, 800-801 (1992) (citing cases involving mishandling of cremated remains, incorrect diagnosis of syphilis, breach of fiduciary duties, and witnessing an injury to a close relative as examples of situations in which damages could be awarded for purely emotional damages).  As explained by the California Supreme Court, "[c]ases permitting recovery for emotional distress typically

---

[12] In Kately, the appellate court allowed the owner of a defective boat to recover damages from the seller and manufacturer of the boat for the emotional distress suffered when the boat malfunctioned and caused fatal injuries to the young girl water-skiing behind the boat.  Kately, 148 Cal.App.3d at pp. 587-588.

involve mental anguish stemming from more personal undertakings the traumatic results of which were unavoidable."   See Erlich v. Menezes, 21 Cal.4th 543, 559 (1999) (citing Burgess v. Superior Court, 2 Cal.4th 1064 (1992) (infant injured during childbirth); Molien v. Kaiser Foundation Hospitals, 27 Cal.3d 916 (1980) (misdiagnosed venereal disease and subsequent failure of marriage); Kately, 148 Cal.App.3d 576 (fatal waterskiing accident); Chelini v. Nieri, 32 Cal.2d 480 (failure to adequately preserve a corpse)).

The law of negligent infliction of emotional distress in California is typically analyzed by reference to two "theories" of recovery: the "bystander" theory and the "direct victim" theory.   Burgess v. Superior Court, 2 Cal.4th 1064, 1071 (1992).   "The distinction between the 'bystander' and the 'direct victim' cases is found in the source of the duty owed by the defendant to the plaintiff."   Id. at 1072.   Bystander liability is premised upon defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another, whereas a right to recover for emotional distress as a "direct victim" arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff.   Burgess, 2 Cal.4th at 1073-1074.

" 'Bystander' cases are cases in which the plaintiff was not physically impacted or injured, but instead witnessed someone else being injured due to defendant's negligence." Wooden, 61 Cal.App.4th at 1037.   " 'Direct victim' cases are cases in which the plaintiff's claim of emotional distress is not based upon witnessing an injury to someone else, but rather is based upon the violation of a duty owed directly to the plaintiff."   Id. at 1038.

Here, because Taylor's alleged emotional distress injuries were a direct result of the use of Honeywell's purportedly defective product (i.e., flight management system), and are not based on witnessing someone else being injured due to Honeywell's negligence, the "direct victim" theory of liability applies to this case.   See Kately, 148 Cal.App.3d at 588 (the user of a defective product is not a mere bystander but a primary and direct victim of the product defect and can recover for emotional distress).   Under the direct victim theory, "there is no independent tort of negligent infliction of emotional distress."   Potter, 6 Cal.4th

at 984; Burgess, 2 Cal.4th at 1072.  Instead, "the tort is negligence, a cause of action in which duty to the plaintiff is an essential element."  Potter, 6 Cal.4th at 984; see also Huggins v. Longs Drug Stores California, Inc., 6 Cal.4th 124, 129 (1993) (negligent infliction of emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply).  However, there is no duty to avoid negligently causing emotional distress to another.  Potter, 6 Cal.4th at 984.  Thus, "unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty."  Id. at 985.

A legal duty "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship."  Potter, 6 Cal.4th at 985.  " 'Whether a defendant owes a duty of care is a question of law.  Its existence depends upon the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability.' "  Burgess, 2 Cal.4th at 1072.

The Court finds that Honeywell's duty of care owed to Taylor is established by law.  A manufacturer/seller of a product is under a duty to exercise reasonable care in its design so that it can be safely used as intended by its buyer/consumer.  Gu v. BMW of North America, LLC, 132 Cal.App.4th 195, 206 (2005) (citing Williams v. Beechnut Nutrition Corp.,185 Cal.App.3d 135, 141 (1986); Pike v. Frank G. Hough Co., 2 Cal.3d 465, 470 (1970)).  The manufacturer's duty of care extends to all persons within the range of potential danger.  Gu, 132 Cal.App.4th at 206.  The evidence before the Court shows that Honeywell sold a flight management system to United Airlines, and that due to a defect in this system, the aircraft Taylor was piloting on the date of the incident was directed to land in the San Francisco Bay instead of at the designated runway at SFO.  Thus, Honeywell's duty to use reasonable care in the design of its flight management system extends to persons using the system as intended such as Taylor.  That duty is provided by the tort law of strict liability.

However, the existence of a duty giving rise to tort liability does not entitle Taylor to recover emotional distress damages on the facts of this case.  While emotional distress damages may be recovered in the absence of physical injury or impact, they are not available in every case upon which there is an independent tort cause of action.  See Erlich, 21 Cal.4th at 555-556, 559; see also Potter, 6 Cal.4th at 985-986; Branch, 6 Cal.App.4th at 800-801.  Even where a defendant has breached a legal duty to a plaintiff, recovery for emotional distress is only available if the emotional distress is proximately caused by the breach, and the breach threatens physical injury.  Erlich, 21 Cal.4th at 555; Potter, 6 Cal.4th at 985; see also Wooden, 61 Cal.App.4th at 1045 (Emotional distress damages are recoverable in the absence of physical injury, "so long as the defendant has breached a duty of care owed to the plaintiff, thereby subjecting the plaintiff to an unreasonable risk of personal injury or illness, and the defendant's conduct is of such a nature that a reasonable person, in the plaintiff's position, would sustain serious emotional distress as a result of such conduct. . . .").  As noted above, recovery of emotional distress damages has only been allowed, absent impact or physical injury, in certain specialized classes of cases.  See Erlich, 21 Cal.4th at 559 (citing cases); Branch, 6 Cal.App.4th at 800-801 (citing cases).

In Potter, the plaintiffs, residents living near a landfill where a tire manufacturer dumped toxic waste, sought emotional distress damages based upon fear of contracting cancer due to their exposure to toxic materials.  The California Supreme Court found that the defendant violated a statutory duty imposed on it by law and regulation to dispose of toxic waste only in a class I landfill and to avoid contamination of underground water, and concluded that this violation led to their ingestion of various carcinogens, thus permitting recovery for emotional distress resulting from fear of cancer.  See Potter, 6 Cal.4th at 985, 997.  The Court held that the plaintiffs' fear of cancer was proximately caused by defendant's unlawful conduct which threatened serious physical injury.  Id. at 985.  In so holding, the Court emphasized that "a breach of duty must threaten physical injury, not simply damage to property or financial interests."  Id.

In <u>Erlich</u>, the plaintiffs sought emotional distress damages based upon negligent breach of a contract to construct a house.  The house, when completed, suffered from extensive and destructive leaking.  <u>Erlich</u>, 21 Cal.4th at 548-550.  The plaintiffs claimed that they feared the house was structurally unsafe and might collapse in an earthquake.  <u>Id.</u> at 557.  The California Supreme Court concluded that although the plaintiffs feared physical injury due to negligent construction, damages for emotional distress were not recoverable because the negligent breach of contract did not cause physical injury, and plaintiffs could have avoided the threatened injury by moving out of the house.  <u>Id.</u> at 555-557.  The Court reiterated the notion that recovery for emotional distress in negligence cases requires breach of duty that threatens physical injury, not just injury to property or financial interests.  <u>Id.</u> at 555.

In reaching its conclusion, the <u>Erlich</u> Court distinguished <u>Potter</u>.  The Court stated that the analysis in <u>Potter</u> was "narrowly circumscribed by the issue presented: 'whether . . . emotional distress engendered by the fear of developing cancer in the future as a result of a toxic exposure is a recoverable item of damages in a negligence action.' "  <u>Id.</u>  The Court explained that the water supply of the plaintiffs in <u>Potter</u> has already been contaminated and the prolonged exposure to the plaintiffs could not be undone.  <u>Id.</u>  In contrast, the Court noted that the plaintiffs in <u>Erlich</u> sought recovery for emotional distress engendered by an injury to their property and they could have avoided the threatened injury by moving out of the house until necessary repairs had been completed.  <u>Id.</u>

In <u>Robinson v. United States</u>, 175 F.Supp.2d 1215 (E.D. Cal. 2001), the plaintiffs sought to recover emotional distress based upon the government's negligence in allowing a prescribed fire to escape onto their property and destroy their house and other real and personal property.  <u>Id.</u> at 1218-1219.  The plaintiffs claimed they suffered emotional distress from, among other things, fear for their own safety during the fire.  <u>Id.</u> at 1219.  The district court concluded that although the government breached its statutory duty to conduct a prescribed fire in such a way to minimize the risk of harm to persons and property, plaintiffs could not recover emotional distress damages as a matter of law because

plaintiffs were not physically injured and they avoided the threat of specific physical injury by evacuating their residence before the fire was in danger of reaching them. Id. at 1228. The court found that plaintiff did not encounter a specific threat of personal injury, but rather faced an avoidable risk of harm, which is not sufficient to recover emotional distress damages under a "direct victim" theory of negligence. Id. The court determined that plaintiffs had not satisfied the Potter standard because "the ten-minute warning allowed Plaintiffs adequate time to escape the specific threat of physical injury which would have provided the reasonable basis to believe that physical injury would likely result." Id. at 1228-1229.

Although Taylor claims that he feared physical injury due to the alleged error in the aircraft's flight management system, the Court finds that he cannot recover emotional distress damages under the facts of this case. The Court finds that this case does not fall within any of specialized classes of cases where emotional distress damages have been allowed in the absence of physical injury or impact. This is not the type of case where the negligence is of a type which would cause highly unusual as well as predictable emotional distress. Here, Taylor claims that he suffered emotional injury as a direct result of Honeywell's defective product. Taylor, however, suffered no physical injury or impact as a result of the navigation database error, and he avoided any threat of harm caused by the error by successfully executing the missed approach or "go-around" procedure that he was trained and required to perform under the circumstances.

The evidence in the record establishes that, due to poor visibility from fog, Taylor was required to perform a missed approach on the first landing approach into SFO regardless of the database error pursuant to established company policies and procedures as well as federal law.[13] The evidence further establishes that Taylor was trained to execute the missed approach in the aircraft he was piloting on the date of the incident, Taylor

---

[13] See 14 C.F.R. 91.175 (no pilot may operate an aircraft or continue an approach below the authorized decision altitude, except under certain limited circumstances). It is undisputed that United Airlines 901 was required to execute a missed approach under the circumstances.

briefed the flight crew on the missed approach procedures prior to the first landing approach into SFO, Captain Langelaar ordered the missed approach (which is not considered an emergency procedure) approximately 135 feet above the decision altitude of 213 feet, Taylor initiated the missed approach within seconds of the order, the aircraft ascended within seconds after the missed approach was initiated, and Taylor briefly viewed the San Francisco Bay after initiating the missed approach.[14]

In light of the foregoing, the Court concludes that the alleged database error did not result in a specific threat of physical injury to Taylor.  Rather, Taylor faced an avoidable risk of harm.  This avoidable risk, not actualized, is not sufficient to allow Taylor to recover emotional distress damages under a "direct victim" theory of negligence.  See Robinson, 175 F.Supp.2d at 1228-1229; see also Erlich, 21 Cal.4th at 555-557 (damages for emotional distress were not recoverable where a breach of duty did not cause physical injury and the plaintiffs could have avoided any threat of physical injury).  Here, similar to the plaintiffs in Robinson, Taylor was not subjected to an unreasonable risk of personal injury such that he is entitled to recover damages for his emotional distress.  See id. at 1228-1229.  Taylor had adequate time to, and did, escape the specific threat of physical injury presented by the database error.  It is undisputed that, due to poor visibility, Taylor initiated the missed approach prior to observing the San Francisco Bay as he was required to do pursuant to company policy and federal law, and that the aircraft responded normally and ascended within seconds of his initiation of the procedure.

Plaintiffs, for their part, have not cited any authority demonstrating that emotional distress damages are recoverable under the facts of this case.  Plaintiffs have failed to cite any authority that has allowed the recovery of emotional damages based on fear for one's own safety where there was no physical injury or impact and where the plaintiff was a trained professional that experienced fear for his safety during the performance of a standard procedure that the he was trained and required to perform.  Nor has the Court

---

[14] Captain Langelaar testified that he did not have any reason to believe that he could not safely "go-around" on the date of the incident.  Langelaar Dep. at 148:21-23.

located any authority that would support the conclusion that emotional distress damages are recoverable on the facts of this case.  No Ninth Circuit or California case has gone so far as to allow emotional distress damages under the circumstances presented here.  Accordingly, Honeywell's motion for summary judgment with respect to Taylor's strict products liability and negligence claims is GRANTED.

### C.    Loss of Consortium Claim

Honeywell contends that summary judgment with respect to Mrs. Taylor's loss of consortium claim is appropriate on the ground that Taylor has no actionable claim.  Def.'s Mtn. at 24.  The Court agrees.

A cause of action for loss of consortium is, by its nature, dependent on the existence of a cause of action for tortious injury to a spouse.  Hahn v. Mirda, 147 Cal.App.4th 740, 746 (2007).  The claim stands or falls based on whether the spouse of the party alleging loss of consortium has suffered an actionable tortious injury.  Id.  Accordingly, because Taylor does not have an actionable tort claim, Honeywell's motion for summary judgment with respect to Mrs. Taylor's loss of consortium claim is GRANTED.

## III.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1.    Honeywell's motion for summary judgment is GRANTED.

2.    This Order terminates Docket 41.

3.    The Clerk shall close the file and terminate all pending matters.

IT IS SO ORDERED.

Dated:  September 28, 2012

SAUNDRA BROWN ARMSTRONG
United States District Judge